# MICHAEL HUESTON
### ATTORNEY AT LAW

| | |
|---|---|
| 16 COURT STREET | Tel: (718) 246-2900 |
| SUITE 1800 | Fax: (718) 246-2903 |
| BROOKLYN, NEW YORK 11241 | Email: mhueston@nyc.rr.com |

ADMITTED NY

April 16, 2020

**BY ECF**
The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:  *United States v. Mirvis*, 17 Cr. 273 (FB)
> Application for release on bail due to changed circumstances or
> For temporary release due to compelling reasons

Dear Judge Block:

### A.    Preliminary Statement

We respectfully seek Mr. Ruslan Mirvis' release on bail pursuant to 18 U.S.C. § 3142(f) due to changed circumstances relating to the COVID-19 pandemic. In the alternative, we respectfully seek Mr. Mirvis' temporary release to his mother's custody pursuant to 18 U.S.C. § 3142(i), which is warranted by the need to prepare his defense and his risk of developing severe illness from COVID-19 due to his underlying medical conditions.  The government opposes this motion.

Ruslan Mirvis has been detained pre-trial at MDC Brooklyn for the past three years. At the time of his arrest, he was 34-years old with no criminal history.  He is indicted with one count each of producing and receiving child pornography, based on allegations that he posed as a teenage boy on Facebook for approximately two months in 2017 and convinced teenage girls to take and send him sexually explicit images and videos of themselves and other minor children. It is not alleged that Mr. Mirvis committed a contact offense, attempted to meet minors in person, distributed images he received, or possessed additional child pornography.

We propose the following release conditions: $150,000 bond to be signed by Mr. Mirvis' parents and his two brothers; home confinement at his parent's Brooklyn apartment; electronic monitoring; strict pretrial supervision; no contact with minors; mental health evaluation and treatment specific to the offense; and no unsupervised access to the internet except to speak to defense counsel, treatment providers and Pretrial Services.

Mr. Mirvis would reside with his parents and one brother in a spacious and well-maintained Midwood apartment. Mr. Mirvis' parents would assume financial responsibility for him and there would be no reason for him to leave the apartment, except for medical treatment if needed.  The family is abiding by the shelter-in-place order, have no symptoms, and do not believe they have been exposed to the virus. To avoid potential contagion, Mr. Mirvis would self-quarantine for 14-days within the apartment, where he would have his own bedroom and bathroom. The family is aware of the nature and severity of the charges Mr. Mirvis faces and remain very supportive of him. They understand and accept that Mr. Mirvis' release would include conditions that would affect them.

As discussed below, changed circumstances warrant reconsideration of his detention and rebut the presumption that he poses a danger to the community or is a flight risk. To the contrary, his release on bail would make the community safer than would his continued incarceration.

In the alternative, temporary release is warranted because Mr. Mirvis is at a critical phase in the proceedings where he requires greater access to counsel than is available under MDC Brooklyn's current restrictions on legal visits and limited availability for phone calls and videoconferences. In addition, Mr. Mirvis is at heightened risk of severe illness if he contracts COVID-19 due to his chronic medical conditions, which include severe obesity and related metabolic problems, liver disease, and an autoimmune disorder treated with an immunomodulator.  He additionally suffers from multiple mental health conditions that require regular and continuous treatment. If released to his mother's custody, he would be far better able to protect his health by self-isolating, obtaining treatment for his chronic medical and mental health conditions, and by seeking emergency medical treatment, if needed.

### B.  Prior Applications for Pre-Trial Release

Mr. Mirvis previously sought pre-trial release on three occasions. At Mr. Mirvis' initial appearance, Judge Kuo rejected as insufficient a proposed bond of $25,000, but granted leave to present a stronger bail package.  ECF. No 4.  At a hearing before Judge Pollak on May 12, 2017, Mr. Mirvis proposed release on a $150,000 bond co-signed by four suretors, home confinement, and restrictions on internet access. Judge Pollak denied the application. *Id*. at 9.  On January 11, 2018, Mr. Mirvis submitted a written bail application requesting reconsideration of the prior order. ECF No. 16.  The government opposed, arguing that no changed circumstances warranted reconsideration and the defense had not rebutted the presumption that Mr. Mirvis was a risk of flight and a danger to the community. ECF No. 17. The application was denied. January 12, 2018 Minute Entry. However, since the last bail application, conditions have changed, and Mr. Mirvis' release now is warranted.

### C. Changed circumstances warrant reconsideration of bail under 18 U.S.C. § 1342(f)

With startling speed, an unanticipated and unprecedented health crisis has overtaken the globe. Mitigating the crisis will require similarly unprecedented efforts. As the Court is undoubtedly aware, incarcerated people are uniquely at risk of contracting the virus and becoming severely ill from it.[1] *See generally* Exhibits A-E (Letters and Declarations of Public Health Experts). The Federal Bureau of Prisons ("BOP") recognizes this truth.[2] The harm extends beyond prison walls into surrounding communities, where inmates are hospitalized, sometimes in substantial numbers. This "overwhelm[s] local medical systems, [] already [] struggling to cope with the number of patients needing prolonged intensive care." Ex. A (Fortune Letter) at 1. Indeed, that very scenario is already playing out around the country. As of April 10, 2020, 42 inmates from FCI Elkton were hospitalized, 18 on ventilators; 10 inmates from USP Lompoc were hospitalized, with two in the ICU; as of April 9, 2020, 16 inmates from FCI Oakdale I were hospitalized, with six in the ICU and two on ventilators.[3]

---

[1] *See* Centers for Disease Control (CDC), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities* (last accessed April 10, 2020); *see also* Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020*), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf*  (co-signed by 814 experts in public health, law and human rights).

[2] "Because of factors unique to the prison setting, this BOP pandemic flu plan assumes a higher death rate...than that estimated for the general population. These factors include the close contact of inmates (increasing risk of flu transmission) and their high rates of other chronic, high risk medical conditions (increasing vulnerability to flu)." Bureau of Prisons, Pandemic Influenza Plan, Module 4: Care for the Deceased, at 1 (October 2012), available at *https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf* ("PIP-4") As BOP has repeatedly noted, the Pandemic Influenza Plan was adapted to address the more virulent novel coronavirus. *See, e.g.,* BOP, Correcting Myths and Misinformation About BOP and COVID-19, *https://www.bop.gov/coronavirus/docs/*.  The Pandemic Influenza Plan assumes a mortality rate for inmates 66.7% higher than for the community. PIP-4, at 1.

[3] Tyler Hayden, *COVID-19 Continues to Fester and Grow Inside Lompoc Prison, Santa Barbara Independent* (April 10, 2020),  https://www.independent.com/2020/04/10/covid-19-continues-to-fester-and-grow-inside-lompoc-prison/; WKBN, *Elkton union disagrees with Bureau of Prisons on COVID-19 numbers* (April 10, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-disagrees-with-bureau-of-prisons-on-covid-19-numbers/; Keegan Hamilton, *Inmates Revolted Against a Federal Prison's Coronavirus Response*, Vice News (April 9, 2020), https://www.vice.com/en_us/article/akwm4j/inmates-revolted-against-a-federal-prisons-coronavirus-response-they-got-tear-gassed.

Public health experts unanimously urge the release of as many inmates as possible as a critical component of reducing health risks and conserving resources. *See, e.g.,* Ex. A at 1. ("Anybody detained for a non-violent offense or who does not pose an immediate danger to themselves or others should be released immediately"). Inmates who are released reduce health risks because they can engage in self-isolating practices. In uncrowded facilities, the inmates who remain are less likely to become ill because they can practice social distancing, feasibly be quarantined or isolated, and receive better care from medical staff and corrections officers who are not stretched thin.

This critical public health consideration bears heavily on what it means to reasonably assure the safety of the community and must be part of the bail calculus. *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, **1-2 (S.D.N.Y. Mar. 19, 2020) (the impact of COVID-19 is a changed circumstance with under 18 U.S.C. § 1342(f)). A "comprehensive view of the danger the Defendant poses to the community requires considering all factors – including this one – on a case-by-case basis." *Id*. (citing *United States v. Raihan*, 20 Cr. 68 (BMC) (JO) (Mar. 12, 2020) ("[t]he more people we crowd into [MDC], the more we're increasing the risk to the community")). *See also United States v. Harris*, No. 19-CR-356, 2020 WL 1482342, at *1-2 (D.D.C. Mar. 26, 2020) (releasing, under exceptional-reasons standard, defendant who had pleaded guilty to distributing child pornography, because "incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on [] strict conditions"); *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) (" Realistically, the best — perhaps the only — way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible").

When the *Stephens* decision was issued on March 18, 2020, "there [wa]s not yet a known outbreak among the jail and prison populations." *Id*. at 2. Not only is there now a known and widespread outbreak, MDC Brooklyn is among the facilities with infected inmates and staff. Ex. F at 18-25. As an incarcerated person with underlying health conditions at an affected facility, Mr. Mirvis is far a greater danger to the community than he would be on home confinement. *See Harris,* 2020 WL 1482342 at *1 ("the risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources and, consequently, the healthcare resources of the surrounding community is real.").

Moreover, in Mr. Mirvis' case, the impact of COVID-19 materially bears on the bail factors in two additional ways to rebut the presumption of danger to the community and risk of flight. First, due to the shelter-in-place order, three of the four suretors would effectively supervise Mr. Mirvis 24 hours a day, seven days a week. The only danger Mr. Mirvis has ever

4

posed is through the internet.[4]  To the extent home confinement, with location monitoring, and no unsupervised access to the internet cannot reasonably assure the safety to the community, that additional supervision certainly can.

Second, the shelter-in-place order, the restrictions on travel, and the potential life-threatening risks of COVID-19 provide additional assurance that Mr. Mirvis will not flee. Mr. Mirvis has no close relatives apart from his parents and brothers, and no ties to any area outside of Brooklyn. He also does not drive and has no means of travel. Furthermore, like most people, Mr. Mirvis fears contracting COVID-19 and is not going to place his own life at risk.

During his three years at MDC Brooklyn, Mr. Mirvis – despite facing some very difficult conditions of confinement – has received no infractions and proved himself to be hard-working and responsible. In his last bail application, counsel noted that Mr. Mirvis had begun participating in programming at MDC Brooklyn, which indicated "his ability and willingness to follow rules[,] traits that make him amenable to supervision." ECF No. 16 at 4. In the more than two years since, Mr. Mirvis has not only continued to take classes, he also holds jobs as a unit orderly, recreation aide, and suicide watch companion. This too offers assurance that Mr. Mirvis will appear in court.

### D. Alternatively, Mr. Mirvis Should be Temporarily Released pursuant to 18 U.S.C. § 3142(i)

In the alternative, Mr. Mirvis temporary release to his mother's custody is warranted under 18 U.S.C. § 3142(i) for two compelling reasons. First, it is necessary to prepare his defense.  Second, it is necessary to protect him from the severe health risks posed by COVID-19.

In *Stephens*, Judge Nathan concluded that release also would be required under 18 U.S.C. § 3142(i), due to the defendant's need for access to counsel before an upcoming VOSR hearing. 2020 WL 1295155, **4-5; *see also United States v. Chandler*, No. 19 Cr. 867 (PAC) (S.D.N.Y. Mar. 31, 2020) (releasing defendant with upcoming trial date), *United States v. Hudson*, 19 Cr. 496 (CM) (S.D.N.Y. Mar. 19, 2020) (same). Similar circumstances are present here.

At the last status conference, the Court advised that if a plea agreement was not reached, the Court would schedule a trial date. January 16, 2020 Minute Entry. The next status conference

---

[4] In another production case before this Court, Your Honor held that the government had not met their burden of proving dangerousness by clear and convincing evidence where "the only potential danger [the defendant] poses to the community is through the Internet. Insisting on a *guarantee* that [the defendant] not have Internet access amounts to impermissibly turning the BRA's standard of reasonable assurance of community safety into one of absolute certainty." *United States v. Deutsch*, 18 Cr. 502 (FB), ECF. No. 20, at 4-5 (E.D.N.Y. December 13, 2018) (emphasis supplied).

is currently scheduled for May 7, 2020. Accordingly, if no agreement is reached, Mr. Mirvis would have to decide whether to go to trial or enter a guilty plea—a critical decision belonging exclusively to a defendant, that must be reached upon full consultation with counsel. In either event, Mr. Mirvis would need access to counsel in order to prepare for trial or prepare for sentencing. Due to the pandemic, access to counsel is severely restricted and will remain so for the foreseeable future. There are no legal visits allowed, limited availability for legal calls and videoconferences, with time limits imposed on those communications. Such restricted communications are wholly inadequate to prepare for either trial or sentencing.

Second, Mr. Mirvis' health conditions, described below, place him at greater risk of severe illness or death if he contracts COVID-19. Moreover, due to the need to focus on emergency care, Mr. Mirvis is at risk of losing treatment for chronic conditions, including mental health treatment. He would be far safer at home in his parents' Midwood apartment, where he could self-isolate, take hygiene measures to protect himself, ensure that he receives treatment for his chronic medical and mental health conditions, and seek emergency medical treatment, if needed. *See, e.g., United States v. Oneill*, 16-CR-561 (DLI) (CLP) (releasing, over government objection, defendant with sickle cell disease, asthma, and low blood count), *United States v. Woolfolk*, 18-CR-115 (DLI) (RER) (releasing, over government objection, defendant with epilepsy to shelter).

### 1. COVID-19 in the BOP

As of April 15, 2020, less than a month after COVID-19 first appeared in the BOP, 16 inmates have died, 500 inmates (not including the deceased) and 291 staff members have tested positive across 56 BOP facilities.[5] At MDC Brooklyn, five inmates and 18 staff members inmates have tested positive.[6] Ex. F at 25. The reported numbers, however, are underinclusive of all confirmed cases and further fail to account for inmates and staff who are symptomatic but untested. For example, the BOP reported that as of April 10, 2020, 10 inmates at FCI Elkton had tested positive. However, a union official reported the actual number was ten times higher.[7] The

---

[5] Federal Bureau of Prisons, Covid-19 Cases, *https://www.bop.gov/coronavirus/* (last accessed April 15, 2020). *See also* Ex. F.

[6] Per the BOP website, *supra* note 5, 18 staff members have tested positive. The April 14, 2020 wardens' letter reports 14. Ex. F at 25.

[7] WKBN, *Elkton union disagrees with Bureau of Prisons on COVID-19 numbers* (April 10, 2020), *https://www.wkbn.com/news/coronavirus/elkton-union-disagrees-with-bureau-of-prisons-on-covid-19-numbers/*(last accessed April 11, 2020); *see also* Dan Kane and Ashad Hajela, *Coronavirus cases surge at Butner prison complex in NC, county official reports*, The News & Observer (April 6, 2020), https://www.newsobserver.com/news/coronavirus/article241801076.html ("59 people have tested positive at the

Honorable Frederic Block                                                                 *United States v. Mirvis*, 17 Cr. 273 (FB)
April 16, 2020

national union president reported that the figures are low because BOP lacks sufficient tests and "do not include inmates or staff members who are ill but not tested.... We really don't know how bad it is[.]"[8] At MDC Brooklyn, only 11 inmates, .6% of the population, have been tested as of April 14, 2020, despite widespread reports of symptomatic inmates and staff.[9]  Ex. F at 25.

### 2. Mr. Mirvis' underlying medical conditions increase his risk of developing severe illness from COVID-19

The virus is more likely to prove fatal or cause severe illness among people with certain underlying medical conditions.[10] Mr. Mirvis has three of those conditions: severe obesity, liver disease, and severe psoriasis, an autoimmune disorder treated with the immunomodulator methotrexate. Ex. G (Medical Records). In addition, Mr. Mirvis also suffers from several mental health conditions, for which he is prescribed five different medications.

<u>Severe Obesity</u>: According to the CDC, a person is obese if he has a body mass index (BMI) of 30 or higher.[11] Mr. Mirvis' last recorded weight was 244 pounds, Ex. G at 15, and his height is 65 inches. Ex. G at 16.[12] Using the BMI calculator on the CDC's obesity webpage, Mr. Mirvis' BMI is 40.6, over the threshold for severe obesity. In addition, Mr. Mirvis was

---

complex, nearly five times what the federal Bureau of Prisons reported over the weekend"); Walt Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks In Prison*, Forbes (April 1, 2020), *https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#499404587ba3*.

[8] Jean Beauge, *Feds will not say if Lewisburg could become an inmate holdover quarantine site*, Penn Live (April 10, 2020), *https://www.pennlive.com/coronavirus/2020/04/feds-will-not-say-if-lewisburg-could-become-an-inmate-holdover-quarantine-site.html*.

[9] Despite the lack of testing, prosecutors have been touting the low numbers of positive tests as proof that the facilities are protecting the inmates' health. *See, e.g.,* Frank G. Runyeon, *Prison Says It Tested Just 2 More Inmates Despite Virus Cases*, Law 360 (April 1, 2020), available at *https://www.law360.com/articles/1259489/prison-says-it-tested-just-2-more-inmates-despite-virus-cases;* Nick Pinto, *As coronavirus looms in federal detention, people inside are being denied constitutional right to speak with lawyers*, The Intercept (April 5, 2020), available at *https://theintercept.com/2020/04/05/coronavirus-federal-prison-mdc-mcc-new-york/.*

[10] CDC, People Who Are At Higher Risk, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html* (last accessed April 12, 2020).

[11] CDC, Defining Adult Overweight and Obesity, *https://www.cdc.gov/obesity/adult/defining.html* (last accessed April 11, 2020).

[12] MDC Brooklyn has three different recorded heights for Mr. Mirvis.

diagnosed with morbid obesity by Kingsborough Jewish Hospital Center. *Id*. at 23.  Mr. Mirvis also has hyperlipidemia, or high cholesterol. *Id*. at 52.

Liver Disease: At just 36 years old, Mr. Mirvis required emergency treatment for acute pancreatitis and surgery to remove his gallbladder.  *Id*. at 22-23.  Testing showed that Mr. Mirvis' liver and spleen were enlarged, his liver enzymes were high, and his liver was infiltrated with fat.  *Id*. at 22-23.  The removal of his gallbladder did not resolve the liver problems. When he was returned to the hospital in February 2019, his diagnosis included fatty liver and inflammation of the spleen.  *Id*. at 36.  Mr. Mirvis' lab tests from February 2020, show elevated levels of the liver enzyme alanine aminotransferase ("ALT").  *Id*. at 51.

Fatty liver "plus signs of inflammation and liver cell damage[] is called nonalcoholic steatohepatitis (NASH)", and is the more severe form of nonalcoholic fatty liver disease ("NAFLD").[13]  Individuals with NAFLD have higher risk of disease progression from COVID-19 and a higher likelihood of suffering liver damage.[14]  Individuals "with underlying liver disease, or risks for liver disease, should be treated similarly to other high-risk groups."[15]

Psoriasis and Immunomodulatory Treatment:  Mr. Mirvis suffers from the autoimmune disorder psoriasis, Ex. G at 1-2, severe enough to require treatment with methotrexate, *id*. at 6, which has immunosuppressive effects.[16]

Mental Health Disorders: Mr. Mirvis has been diagnosed with bipolar disorder, depression, and post-traumatic stress disorder ("PTSD"). *Id*. at 1. He is treated for these disorders with buspirone, *id*. at 4, Depakote (divalproex), *id*. at 5, Remeron (mirtazipine), *id*. at 7, Zoloft

---

[13] Johns Hopkins Medicine, Conditions and Diseases, Nonalcoholic Fatty Liver Disease, *https://www.hopkinsmedicine.org/health/conditions-and-diseases/nonalcoholic-fatty-liver-disease* (last accessed April 10, 2020).

[14] Ji et al., Implication of non- alcoholic fatty liver diseases (NAFLD) in patients with COVID-19: a preliminary analysis, Journal of Hepatology (2020), *https://doi.org/10.1016/j.jhep.2020.03.044.*

[15] Nancy S. Reau, M.D., *Liver Disease, Liver Damage, and COVID-19 Coronavirus*, MedicineNet (March 22, 2020), *https://www.medicinenet.com/script/main/art.asp?articlekey=229150* (last accessed April 10, 2020).  *See also* NYU Langone Health/NYU School of Medicine, Experimental AI tool predicts which COVID-19 patients develop respiratory disease (March 20, 2020), *https://www.sciencedaily.com/releases/2020/03/200330152135.htm* (last accessed April 10, 2020) (high ALT levels were one of three primary predictors for who would develop subsequent, severe disease).

[16] Menter, et al. (2009). Guidelines of care for the management of psoriasis and psoriatic arthritis Section 4. Guidelines of care for the management and treatment of psoriasis with traditional systemic agents. Journal of the American Academy of Dermatology. 61. 451-85. 10.1016/j.jaad.2009.03.027.

Honorable Frederic Block  
April 16, 2020

*United States v. Mirvis*, 17 Cr. 273 (FB)

(sertraline), *id*. at 8, and Trazadone. *Id*. According to BOP's current clinical guidance, an inmate with "[m]ultiple diagnoses treated with ≥ 5 psychotropic medications" is classified as Medical Care Level 3, defined as inmates with "complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." [17]

Notably, MDC Brooklyn does not have a good track record when it comes to Mr. Mirvis' medical treatment. His medical records provide four clear examples:

- In January 2019, Mr. Mirvis returned to MDC following 11 days in the hospital, where he had received emergency pancreatitis treatment and gallbladder surgery. Ex. G at 22-23. Shortly after his return from the hospital, while MDC Brooklyn was locked down,[18] Mr. Mirvis suffered from gastrointestinal pain, vomiting, and diarrhea for a week before he was able to see a doctor. When at last he received medical attention on February 6, 2019, he was immediately returned to the hospital, where it took three days for his condition to stabilize. Ex. G at 31-42.

- In June 2018, an outside dermatologist ordered a biopsy of a skin lesion to take place the following week. Ex. G at 55. MDC rescheduled the biopsy multiple times and it did not take place until October 2019. *Id*. at 60.

- In 2018, Mr. Mirvis had to wait seven months, in pain, for a routine tooth extraction. *Id*. at 61-65.

- In 2019, Mr. Mirvis was prescribed two medications known to cause liver damage, which require monitoring by regular blood tests, especially during the first six months.[19] *Id*. at

---

[17] BOP, Care Level Classification For Medical And Mental Health Conditions Or Disabilities, Clinical Guidance, May 2019, p.7, *https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf*

[18] *See* Nick Pinto, *The power is back on at Brooklyn jail, but a visiting federal judge found untreated gunshot wound, "black blotchy mold," and ongoing crisis*, The Intercept (February 6, 2019), available at *https://theintercept.com/2019/02/06/mdc-brooklyn-metropolitan-detention-center-federal-judge-tour/* (last accessed April 10, 2020).

[19] Menter, *supra* note 16. ("Hepatotoxicity is a well-known side effect of methotrexate"); Depakote Prescribing Information*, https://www.depakote.com/prescribing-information (*last accessed April 11, 2020) ("Do not take Depakote if you have liver problems"); BOP, Management of Bipolar Disorder, November 2016, p33 *https://www.bop.gov/resources/pdfs/mgmt_bipolar_disorder.pdf* (last accessed April 12, 2020) (For Depakote patients, liver enzymes to be monitored at "baseline and frequently during the first 6 months."); Methotrexate Tablets, USP, *https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/008085s066lbl.pdf* ("During therapy of [] psoriasis, monitoring of these parameters is recommended: hematology at least monthly, renal function and liver function every 1 to 2 months").

5-6.  Yet, Mr. Mirvis, diagnosed with liver disease, was prescribed both medications simultaneously for 10 months with no monitoring. *Id*. at 46. His most recent labs show elevated liver enzymes. *Id*. at 51.

According to Dr. Meyer, such "delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected." Ex. D at ¶ 26 (Meyer Declaration). Moreover, "facilities with a track record of neglecting individuals with acute pain and serious health needs under ordinary circumstances are more likely to be ill-equipped to identify, monitor, and treat a COVID-19 epidemic." *Id*. at ¶ 32. Mr. Mirvis' prior experiences provide a clear basis to believe that he will not receive adequate care during the instant crisis.

### E.  Conclusion

For the reasons discussed above, Mr. Mirvis should be released.  Circumstances have changed profoundly and his release on bail, upon reconsideration, is clearly warranted. Alternatively, temporary release is compelled by Mr. Mirvis' need for access to counsel at a critical juncture in his case, and because his pre-existing medical conditions pose a significant risk to his health if he contracts COVID-19.   In a time of crisis, our response to those at particularly high risk must be with compassion, while balancing the needs of society.

Counsel consents to a telephonic bail hearing at the Court's earliest convenience.

Respectfully submitted,

s/ Michael Hueston
Dorea Silverman

cc:     A.U.S.A. Drew Rolle