UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,

<u>Unredacted Copy</u> – <u>Filed Under Seal</u>

-against-                                17 Cr. 273 (S-1) (FB)

RUSLAN MIRVIS,

Defendant.

-----------------------------------------------------------------x


**RUSLAN MIRVIS'S SENTENCING MEMORANDUM**




MICHAEL HUESTON, ESQ.
16 Court Street, 35th Floor
Brooklyn, New York 11241
(718) 246-2900

DOREA SILVERMAN, ESQ.
80 Broad Street, Suite 1900
New York, New York 10004
(917) 863-9905

*Attorneys for Ruslan Mirvis*




Dated:     Brooklyn, New York
           September 25, 2024

## A. Introduction

Ruslan Mirvis addresses the following issues related to his appropriate sentence. Mr. Mirvis was charged in a two-count indictment with sexual exploitation of a child and receipt of child pornography. The charges concern Mr. Mirvis's solicitation of sexual images and acts from children over Facebook during a three-month period in 2017.

"This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006). Mr. Mirvis respectfully requests that the Court impose a sentence of ten years, the mandatory minimum, under the Court's authority under 18 U.S.C. § 3553(a) to achieve those ends. Since his arrest, Mr. Mirvis, a man with no criminal record, has grappled with deep regret for his actions. It is critical to recognize that he has not shied away from the gravity of his crimes. He acknowledges and accepts full responsibility for the harm he has caused. This memorandum will discuss the nexus between Mr. Mirvis's offense conduct and his childhood. The middle son of a family of refugees who'd fled from what was then the Soviet Union, Mr. Mirvis struggled alone with intellectual developmental impairments, which were then compounded by years of ███████ and its related trauma. As a result, Mr. Mirvis grew up emotionally stunted in many ways and had difficulty understanding social norms and regulating his impulses. However, in highlighting these aspects of Mr. Mirvis's life, we aim to show how he has sought treatment, discussion, and therapeutic resources where available, to come to terms and learn from the crimes that have brought him before the Court today.

Mr. Mirvis writes in his letter to the Court: "I hurt the victims of my crimes terribly. They are not responsible for what I did to them. I hope they all continue to heal. I am so sorry for what I did to them." *See* Mr. Mirvis's letter to the Court at Exhibit 1.

As of the date of this submission, Mr. Mirvis has been detained for 89 months. Authorities arrested him on a complaint in April 2017 for a violation of 18 U.S.C. §§ 2251 and 2251(e), with sexual exploitation of children, and then indicted him in May 2017 for the same offense in addition to receipt of child pornography in violation of 18 U.S.C. §18 U.S.C. § 2252(a)(2), 18 U.S.C. § 2252(b)(1). *See* Doc. Nos. 1 and 8.

In December 2021, Mr. Mirvis pled to a superseding information charging him with a violation of New York State Penal Law § 263.15 and 18 U.S.C. § 2422(b), for using the internet to induce an individual who had not attained the age of 18 years to engage in sexual activity for which a person could be charged with a criminal offense, specifically, promoting a sexual performance by a child, which carries a mandatory minimum of 10 years. *See* Doc. No. 51. This is significant because the indictment carried a 15-year mandatory minimum.

During Mr. Mirvis's incarceration, he has been physically and ███████████, extorted, and threatened. Indeed, an inmate recently physically assaulted him. Currently housed in Essex County Correctional Facility and previously housed in MDC Brooklyn, Mr. Mirvis has spent most of his detention in protective custody, confined to his cell for up to 23 hours a day. During his stay at MDC Brooklyn, which overlapped with the COVID-19 pandemic, Mr. Mirvis's serious medical needs were ignored until eventually, he had to be hospitalized.

Given the nature of his crimes, as outlined in the Presentence Report, there is no denying that Mr. Mirvis engaged in abhorrent, inexcusable behavior. With no criminal history, Mr. Mirvis's conduct seemed to arise out of nowhere. A quiet 34-year-old, Mr. Mirvis spent most of

his time in a cluttered Midwood apartment, attending to the needs of his parents who both suffered serious physical and psychological ailments.

However, as the reports of forensic pathologist Dr. N.G. Berrill, Ph.D. and mitigation specialist, Anna Bulkin, MSW make clear, Mr. Mirvis had been silently struggling most of his life. *See* Exhibits 2 and 3 (under seal). The reports detail developmental and intellectual impairments, social difficulties, and ███████ The reports describe how at a particularly vulnerable age, and during a time when his family was fully preoccupied with other matters, Mr. Mirvis ██████████████████████ While Mr. Mirvis's life experiences certainly do not excuse his criminal conduct, we believe it provides valuable context to the Court.

Further, Mr. Mirvis's letter to the court shows his recognition of the substantial emotional damage he caused the victims and their families. Certainly, no apology can take away their pain and distress, but Mr. Mirvis is sorry and wishes he could repair the damage he caused.

In sentencing Mr. Mirvis, we ask the Court to consider mitigating factors that support a sentence of 10 years. Those factors, discussed in the submission and detailed in the expert reports, include his intellectual developmental challenges, ████████████████ ████████████████████; the aberrant nature of his conduct compared to his otherwise law-abiding life; the particularly harsh treatment he received during his lengthy period of pretrial detention; ███████████████████ ███████████████; and the tremendous efforts he's made to improve himself while in custody.

We will address this combination of factors and legal arguments regarding Mr. Mirvis's 18 U.S.C.§ 3553(a) factors. We believe that they demonstrate that the Court does not need to

impose a guideline sentence, or the Probation Office's recommended sentence of 300 months in custody, to deter Mr. Mirvis or send a message to society regarding his conduct but instead provide a pathway towards his rehabilitation.

**B.     Mr. Mirvis's Background and Characteristics**

Information relating to Mr. Mirvis's background and characteristics are discussed in the Presentence Report, his letter to the Court, his letters of support, medical records, certificates and transcripts, and the defense's psychosexual evaluation and mitigation report.[1]  The following draws from those materials, information he has asked counsel to retell, and other items as noted.

Mr. Mirvis is a 41-year-old Jewish man born in Odessa, Ukraine in what was then the Union of Soviet Socialist Republics.  He is the second of three sons born to Marina Yudkiss and Mikhail Mirvis. His older brother Alex was also born in the Soviet Union, while his younger brother Richard was born in the United States. Mr. Mirvis has an older half-sister by his father.

Ukrainian Jews in the Soviet Union, including the Mirvis family, were subjected to pronounced anti-semitism and repression.  In 1989, thousands left Ukraine for the United States as part of a larger exodus of Jews from the Soviet Union.  This period was a significant moment in history, as it followed the policies of Glasnost and Perestroika.  Once in the United States, Mr. Mirvis and his family lived with extended family in Brighton Beach, Brooklyn.  From Brighton Beach, they moved to an apartment building in Kensington. Mr. Mirvis's parents were focused on surviving and settling into their new lives.  Marina did not speak English.  She cleaned houses.  She hoped to be certified as a nurse but had to start as a nurse's assistant before becoming a medical assistant.  Mikhail worked installing alarms, and then as a supervisor in a

---

[1]*See* Exhibits 1 (Mr. Mirvis's letter to the Court); 2 (Defendant's Psychosexual Evaluation – Under Seal); 3 (Defendant's Mitigation Report – Under Seal); 4 (Family and Friend's Letters of Support); 5 (Inmate Letters of Support); 6 (Medical Reports – Under Seal); 7 (Government's November 28, 2020 letter to the Court re: Cooperation – Under Seal); 8 (Certificates and Transcripts); 9 (Defendant's Charitable Donations and Correspondence) and 10 (Government's February letter to the Court re: Inmate Assault – Under Seal).

factory located in Jersey City. Later, he worked singing in Russian restaurants and in an elder care center before he started to lose his vision due to macular degeneration, and had to stop working and collect disability. Over the years, Mr. Mirvis's parents' relationship fell apart and they were separated for some time.

Mr. Mirvis's parents enrolled him in a yeshiva school, but it was too expensive, so they switched him to a public school. According to the New York City Board of Education, Elementary School Cumulative Record, he began the first grade in January 1990 at P.S. 253, when he was 7 years old in an English as a second language class. Records indicate that, by 1992, he was getting remedial math help, and, in 1993, he was referred for speech therapy.

In 4th grade, Mr. Mirvis transferred to P.S. 179. While Mr. Mirvis recalled liking music and art in elementary school, in all his academic classes he received "Needs Improvement". As Mr. Mirvis stated, "I was in a special ed. I had speech problems, and I was afraid to speak up in school. I blocked out a lot of what happened. But I was bullied by other kids and they used to make fun of me. So eventually I just stopped going…. I was always just trying to fit in."

While Mr. Mirvis was still in elementary school, Marina was diagnosed with breast cancer, which eventually went into remission. A few years later, ███████████████████ ███████████████████████████ At the same time, Mr. Mirvis's older brother Alex left home at 18 and joined the Army and was only home sporadically. Mr. Mirvis recalls, "I felt like I was raising myself." Mr. Mirvis had few friends. In junior high school at I.S. 223, Mr. Mirvis cut school regularly. School records show he had failing grades. In 8th grade, Mr. Mirvis began delivering pizzas, missing more and more school.

In Kensington, Mr. Mirvis became close with the maintenance man for the building, Gerald Gondre. When Gondre learned Mr. Mirvis was skipping school instead of telling his

parents, he had Mr. Mirvis work with him around the building. Gondre introduced him to marijuana and ecstasy, as well as alcohol, which Mr. Mirvis started to use regularly. █████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

    ████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

    ████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████

Despite his failing grades, Mr. Mirvis began high school at the Franklin Delano Roosevelt High School. According to Franklin Delano Roosevelt High School records, he failed his 9th grade year but was again promoted to the 10th grade. In 1998, at age 15, he began the 10th grade but soon dropped out.

No longer in school, Mr. Mirvis got his first restaurant job. Mr. Mirvis worked at several different restaurants, including the Stage Deli and Angelo and Max's Steakhouse. He learned how to cook and found that cooking calmed him and made him feel good about himself. At 17, Mr. Mirvis briefly lived with a friend before returning home. When Mr. Mirvis was 18, his family moved to Midwood, Brooklyn. They had a larger apartment, and, for around five years, at least 12 people lived in it, including Mr. Mirvis's extended family. From 1999 to 2005, Mr. Mirvis worked for Metro Kitchen, a company that built and installed kitchen cabinets. He then went back to working at restaurants, starting for three years at Kosher Delight and then at Gourmet on J, where he worked for close to 10 years before it was sold and became Mechy's Gourmet. The new owner kept Mr. Mirvis at lower pay and hours while firing many of the staff. This is why Mr. Mirvis initially started his own event planning company, Mirvis Events. Although Mr. Mirvis dreamed of success, his limitations kept him from becoming a successful businessman, and he failed and was sued by a client. This failure coincided with the start of the present offense: he was "depressed, spiraled, and gave up on everything. I took my anger out on everyone else and that's when things happened."

Mr. Mirvis has been detained since his arrest in April 2017. He was initially placed at the MDC. Soon after going to MDC, other inmates extorted hundreds of dollars from him which his mother had transferred into his commissary accounts, as well as from a bank account belonging to one inmate's girlfriend. When Mr. Mirvis could no longer pay, they attacked Mr. Mirvis.

According to Bureau of Prisons, Health Services records, Mr. Mirvis reported being "[ ███████ ███████ ] assaulted multiple times from June to July 2017, in his cell, by 2 other inmates." He had three fractures to his ribs.

Mr. Mirvis was placed in segregated housing during MDC's investigation of this incident. While there, he witnessed a cellmate try to kill himself. BOP Medical records contain an email he sent to psychology staff about both this and the impact on him of waiting for someone to come help his cellmate.

On January 3, 2019, Mr. Mirvis was taken to Kingsbrook Jewish Medical Center, where he had his gallbladder removed. BOP Medical records show that on January 1, 2019, he was diagnosed with major depressive disorder and post-traumatic stress Disorder, and was placed on antidepressants and PTSD medication. Towards the end of January 2019, while he was still recovering from gallbladder surgery, MDC was without power and heat for over a week. There were multiple reports at the time of the lack of hot water and no hot meals. Mr. Mirvis reported that he was not getting the medication and the special diet he was on due to his recent surgery.

MDC did not have a good track record when it came to Mr. Mirvis's medical treatment. Aside from the emergency gallbladder surgery, in June 2018, an outside dermatologist ordered a biopsy of a skin lesion to take place the following week, which did not take place until October 2019. In 2018, Mr. Mirvis had to wait seven months, in pain, for a routine tooth extraction. In 2019, Mr. Mirvis was prescribed two medications known to cause liver damage, which require monitoring by regular blood tests. Yet, Mr. Mirvis, diagnosed with liver disease, was prescribed both medications simultaneously for 10 months with no monitoring.

Despite being housed in the SHU at MDC, Mr. Mirvis participated in every program that he could access. On June 6, 2019, Dr. De Zayas, a staff Psychologist at MDC, selected Mr.

Mirvis to be part of the prison's male suicide watch program, and Mr. Mirvis served in this role for almost a year.  He was recognized with an exemplary service award for being a recreation aide.  He completed card-making and origami classes as part of his training as a recreation aide. He took advantage of these opportunities at MDC until the COVID-19 pandemic caused the building to be fully locked down for months, with Inmates staying in their cells for almost 24 hours a day.

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

- ██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████

    In March 2021, Mr. Mirvis was transferred to the Essex County Correctional Facility in Newark, New Jersey, where he is held in the Involuntary Protective Custody unit.  Until eight months ago, he was a kitchen orderly/trustee and brought meals to individual cells.  This ended

when he was taken to a different unit by a corrections officer to deliver meals and was attacked by another inmate who injured his left eye. He is now responsible for collecting, cleaning, and charging the tablets on the unit. Mr. Mirvis's unit is in their cells 22 hours a day, but his responsibilities allow him a little extra time out of his cell.

In addition to participating in any in-custody program he can, Mr. Mirvis has enrolled in multiple online programs. He has completed GED classes but has not yet taken the GED tests. The Aleph Prison Program puts into his commissary and has directly paid for some of his classes, including the Blackstone paralegal courses. He spends his commissary money on courses through such organizations as Getting Out by Going In ("GOGI") and purchasing self-help books. Through GOGI, he completed a victim impact program to examine cognitive distortions that he may have. Mr. Mirvis also gets support from two rabbis who visit the jail – one of whom is associated with the Essex County Correctional Facility, and the other is an orthodox rabbi.

Mr. Mirvis's conduct following his arrest shows his commitment to addressing the underlying issues that influenced his crimes. Since being arrested, he has actively engaged in self-reflection, introspection, personal growth, and self-improvement. The letters in support of Mirvis provided with this submission substantiate this view. Several inmates have written letters on his behalf, including one from Jonathan Espinal, thanking Mr. Mirvis for saving his life, which demonstrate Mr. Mirvis's positive qualities as a helpful and compassionate person. His brother Alexander writes,

> Your Honor, I implore you to consider the entirety of Ruslan's character and his contributions to our family's well-being. While he may have made mistakes, his heart remains steadfast in its commitment to kindness and compassion.

His brother Richard writes:

I still believe that my brother deserves a chance to atone and reintegrate into society as a productive and morally upright citizen. I have faith in his capacity for redemption through participation in academic, mental health, and vocational programs.

Mr. Mirvis's mother writes:

During his time at MDC Brooklyn and Essex County Correctional Facility, Ruslan has been committed to furthering his education despite the challenges of incarceration. He has actively pursued educational opportunities, demonstrating a strong determination to improve himself and acquire new skills. Ruslan has completed courses in criminal law and paralegal studies, earning certificates through Blackstone Academy. I am so proud and hopeful that Ruslan has embraced learning as a means of transformation and has shown resilience in being incarcerated.

Ruslan's immediate plans for the future are to return home and work. However, my true hope is that he finds stability, safety, and commitment to self-improvement. He understands the need for change, and I am confident in his capacity for growth as my son. He will absolutely not be alone on this journey. He has a strong support network in myself, his family, and my friends. We are all prepared to stand by him, offering unwavering support and guidance as he navigates a path toward redemption…. I understand the seriousness of Ruslan's actions, and I am not writing to make excuses for him.

But I ask you to consider the devastating consequences of deportation on his life and his ability to make amends to the world. With your guidance and the chance to remain in the country, I believe Ruslan can work towards redemption, be a part of our family again, and become a valuable member of the community.

Finally, Mr. Mirvis writes to Your Honor:

I am disciplined and committed to growing and not falling back. Other inmates call me the "book crusher" because I'm always reading. I am committed to regaining the trust I broke with society. I know that I deeply hurt my victims, and I want them to know they have the power to overcome what I did to them.

## C.   Charges and Plea, Offense Conduct and Acceptance of Responsibility

Mr. Mirvis is a first-time, non-violent offender who accepts responsibility for his

conduct. In December 2021, Mr. Mirvis pled guilty to an information charging him with a

violation of New York State Penal Law § 263.15 and 18 U.S.C. § 2422(b), for using the internet to induce an individual who had not attained the age of 18 years, specifically to engage in sexual activity for which a person could be charged with a criminal offense, specifically, promoting a sexual performance by a child, which carries a mandatory minimum of 10 years.

Mr. Mirvis's conviction carries a minimum of 10 years incarceration and a maximum of life, 18 U.S.C. § 2422(b), and the term of supervised release is five years to life. 18 U.S.C. § 3583(k).

The parties and the Probation Office agree that Mr. Mirvis's guideline level is life. In the plea agreement and the PSR, Mr. Mirvis's total offense level is 51 with a criminal history category of I, which results pursuant to Chapter 5, Part A, as an offense level of 43.

The Probation Office has recommended a non-guidelines sentence of 300 months of incarceration and five years of supervised release.

Mr. Mirvis was chronologically 34-years old when he committed the charged offenses; however, intellectually, developmentally, and emotionally, he was much younger. He was a special needs child who never received adequate help. He grew up in a chaotic environment, raised by parents who, while well-meaning, were too overwhelmed as émigrés and a series of medical crises and ill-equipped to address – or even recognize – Mr. Mirvis's need for help.

Mr. Mirvis's criminal conduct took place over approximately three months in 2017. During that period, he created a Facebook account in which he presented himself as a teenage boy. Using that account, he communicated with adolescent girls and asked them to perform sexual acts and create and send him sexually explicit pictures and videos of themselves, which they did, as detailed in the PSR. He did not meet the victims in person. He did not distribute the images or videos to others. He has no prior criminal convictions and no history of sexual

misconduct.  He employed no efforts to hide his IP address, often logging on to his actual

Facebook account at the same time he logged in to the fake account.  And as Dr. Berrill states in

his report,

> At this point in time, he does not impress as someone who poses a
> likely threat to himself or others, nor is he someone who could be
> characterized sexually attracted to minors.

*See* Exhibit 2 (Under Seal) at p. 16.



Mr. Mirvis has worked hard at rehabilitation.  As mentioned, he has taken numerous

courses, including domestic violence and sexual abuse programs.  Mr. Mirvis's post-arrest

conduct is a mitigating factor regarding his 18 U.S.C. § 3553(a) analysis, which we discuss

*infra*.  *Cf. Pepper v. United States*, 562 U.S. 476, 492-93 (2011) (reasoning that "postsentencing

conduct also sheds light on the likelihood that he will engage in future criminal conduct . . . [and]

exemplary postsentencing conduct may be taken as the most accurate indicator of 'his present

purposes and tendencies and significantly to suggest the period of restraint and the kind of

discipline that ought to be imposed upon him." (internal citation omitted); *United States v.

Walker*, 252 F.Supp.3d 1269, 1294 (D. Utah 2017) (Twenty years of prison sentences failed to

accomplish the deterrence achieved by a self-motivated defendant and a tough, yet effective

treatment program.").

**D.      Comments and Objections to the Presentence Report**

By letter, we commented on the Presentence Report to correct and add to identifying data; personal and family data; and educational, vocational and special skills**.**  *See* Doc. No. 61. They do not impact the guidelines.  We are not requesting a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

**E.      18 U.S.C. § 3553(a)**

We respectfully request that the Court impose a non-guideline sentence of 10 years' incarceration followed by 5 years of supervised release.  This total sentence would be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. § 3553(a), considering Mr. Mirvis's history and characteristics, the nature of the offense, the need to provide educational or vocational training, the need for general and specific deterrence, and the need to avoid sentencing disparities.  This Court is not required to impose a sentence based on the guideline or any Sentencing Commission policy that circumvents Congress' specific intent for individualized sentencing.  *Pepper v. United States*, 562 U.S. 476, 501 (2011).  Further an individual assessment that considers Mr. Mirvis's character and background supports a 10-year sentence as "sufficient, but not greater than necessary" to achieve the sentencing objectives in this case.  *See* 18 U.S.C. § 3553(a)(1).

The guidelines fail to include critical factors about Mr. Mirvis's background, which Congress mandated must be included in arriving at the sentence to be imposed.  *See* 18 U.S.C. § 3553.  When offenders' backgrounds and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved. Rather, offenders are left to the mercy of mathematical numbers that arrive at terms of incarceration with no empirical relationship to either punishment or the causes that brought them before the court.  *See generally United States v. Adelson*, 441 F. Supp. 2d at 512 (court

commenting on "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Anthony M. Kennedy, *Speech at A.B.A. Annual Meeting* (Aug. 9, 2003) (criticizing the guidelines as "too severe" and called for a general, across-the-board reduction in guidelines sentences).[3] But in asking for a variance for Mr. Mirvis, it is worth deconstructing the Sentencing Commission's position regarding its mission, as we believe it shows why the guideline are often so flawed and heavy-handed. *See Rita v. United States*, 551 U.S. 338, 352 **(**2007) (discussing guidelines failure to properly to reflect §3553(a) considerations).

The Sentencing Reform Act ("SRA"), enacted in 1984, created the Sentencing Commission and instructed it to promulgate guidelines that would reconcile the multiple purposes of punishment while promoting the goals of uniformity and proportionality. *See* 28 U.S.C. §§ 991(b)(1)(A) and 991(b)(1)(B). That sounds reasonable. And under the SRA, the Commission was directed that it should "develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of Title 18, United States Code," 28 U.S.C. § 994(m), and "establish sentencing policies and practices" that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). That also sounds reasonable.

However, absent in the Commission's mission was 18 U.S.C. § 3553(a)(1)'s mandate, which states that "in determining the particular sentence to be imposed, [the court] shall consider— (1) the nature and circumstances of the offense and the history and characteristics of the defendant[.]" *Compare* 18 U.S.C. § 3553(a) to 28 U.S. Code §§ 991 (United States Sentencing Commission; establishment and purposes) and 994 (Duties of the Commission).

---

[3]*See* https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html.

As stated in 28 U.S.C. §§ 991 and 994, the Commission's purposes and duties are to support 18 U.S.C. § 3553(a)(2)'s goal: "the need for the sentence imposed…." *See* 28 U.S.C. §§ 991 and 994. Neither code references 18 U.S.C. § 3553(a)(1), which undercuts the Commission's purported goal of the "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). This omission and strange oversight, is one of the reasons why the guidelines are so skewed against defendants and why, we submit, courts are not required to impose a sentence based on them. *Pepper v. United States*, 562 U.S. at 501.

This is why courts must be careful to guard against the "unintended anchoring effect that the [G]uidelines can exert" leading to "irrationally assign[ing] too much weight to the guidelines range[] just because it offers some initial numbers." *United States v. Ingram*, 721 F.3d at 40 n.2 (internal quotation marks and citations omitted); *see generally* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" And "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489 (2014).

That same caution applies here regarding U.S.S.G. § 2G2.2.

### 1.      Heavy Handedness of U.S.S.G. § 2G2.2

In *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), the Circuit addressed the automatic and severe Guideline enhancements in child pornography cases, and cautioned that the enhancement under U.S.S.G. § 2G2.2 is "fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." 616 F.3d at 184. The court noted that § 2G2.2 enhancements typically led to guideline ranges at or beyond the statutory maximum of the underlying offense, "based solely on sentencing enhancements that are all but inherent to the crime of conviction." *Id.* at 187. The

court further observed that application of the enhancement resulted in virtually "no distinction" between the sentencing of "the most dangerous offenders" and non-dangerous offenders, who have little to no criminal history. Id. The concentration of all offenders at or near the statutory maximum was, according to the court, "fundamentally incompatible with § 3553(a)." 616 F.3d at 187.

The court was particularly troubled that § 2G2.2 was not based on empirical data developed by the Sentencing Commission. *Dorvee*, 616 F.3d at 186. Sentencing courts determine the weight owed to the Guidelines by considering the "specialized experience and broader investigations and information available to the [Sentencing Commission]" as it compares to the sentencing court's own technical or other expertise. *Dorvee*, 616 F.3d at 188. When a particular enhancement has no empirical support, and therefore "do[es] not exemplify the Commission's exercise of its characteristic institutional role," a sentencing court may conclude that the Guidelines' treatment of a particular type of conviction typically yields sentences "greater than necessary." *Id.* (quoting *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)). *See also United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses").

While acknowledging the importance of enforcing federal prohibitions on child pornography, the court encouraged district courts to exercise the "broad discretion they possess in fashioning sentences under § 2G2.2 … bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Dorvee*, 616 F.3d at 188.

The concerns articulated by *Dorvee* apply here, and we ask for a downward variance. *See*, e.g., *United States v. Jenkins*, 854 F.3d 181, 189 (2d Cir. 2017) ("The concerns we expressed in *Dorvee* apply with even more force here and none of them appears to have been considered by the district court. Jenkins received precisely the same "run-of-the-mill" and "all-but-inherent" enhancements that we criticized in *Dorvee*, resulting in an increase in his offense level from 22 to 35.  These enhancements have caused Jenkins to be treated like an offender who seduced and photographed a child and distributed the photographs and worse than one who raped a child.").

As mentioned, Mr. Mirvis did not meet the victims or distribute the images or videos.  He has no prior criminal convictions and no history of sexual misconduct.  His conduct occurred over three months.  So, respectfully, we ask the Court to vary from this guideline based on the guideline's unempirical design and unreasonable severity.

2. **Lack of Guidance as a Youth and Similar Circumstances and Socioeconomic Status**

There are powerful forces, including parental neglect, unaddressed intellectual developmental disabilities, and physical █████████████, that served to impact Mr. Mirvis's life from an early age as discussed in our experts' reports.  Mr. Mirvis is a now 41-year-old man who, while 34 years old at the time of the offense, was intellectually and developmentally much younger.  Both school and daily functioning were extremely hard for Mr. Mirvis.  Except for a few months, he never lived independently from his parents.  Mr. Mirvis has masked his ability and limitations.  Masking is behavior that refers to the strategies individuals may employ to hide or compensate for their difficulties in intellectual functioning or adaptive behavior.

His intellectual disability was only compounded by ███████████████████████ ████████ Mr. Mirvis experienced " complex/developmental trauma which relates to abusive or threatening conditions sustained over a period of time, usually pertaining to childhood, and often occurs in (but is not exclusive to) the context of close relationships, where escape is difficult or impossible." As stated in our mitigation report, research tells us that this type of abuse "or adverse childhood experiences (ACEs) can have an impact on the cognitive and emotional development of the child." Mr. Mirvis grew to a man who in many ways was emotionally stunted and never sure how to navigate the world.

As detailed in our mitigation report, Mr. Mirvis was desperate to fit in but struggled in both friendships and potential romantic relationships. Mr. Mirvis has a pattern of putting others and their needs ahead of himself with the hope of pleasing either peers or prospective sexual partners, but he is unable to develop and maintain a healthy relationship. When he was still in the community, he wanted more than anything to help his parents when they could no longer work and was embarrassed and ashamed when his attempt to start his own business was such a failure. Forensic pathologist, Dr. Berrill, noted the WASI-II intelligence quotient test indicated that Mr. Mirvis achieved a Full Scale IQ of 72, placing him at the 3rd percentile. His Perceptual Reasoning score was 73, placing him at the 7th percentile and his Verbal IQ was 76, placing him at the 5th percentile.

As our expert reports demonstrate, ███████████████████ of individuals with cognitive impairments like Mr. Mirvis's can affect a person's ability to understand social norms, regulate impulses, and comprehend the consequences of their actions, which may increase the risk of engaging in sexually harmful behaviors. However, Mr. Mirvis has shown that he has a true interest in understanding the root causes behind his behaviors. While the offerings in a detention

setting are limited, Mr. Mirvis has taken every step to find and engage in as many programs as he can.  On his own, he has considered the impact his actions have had on his victims and how his trauma history, which he has never previously discussed with anyone, may have played a role in his actions.  Dr. Berrill notes that Mr. Mirvis has clearly benefitted from his concerted efforts to seek out and participate in his own treatment and recommends that Mr. Mirvis participate in structured therapeutic programs upon his release from prison.

While Mr. Mirvis is not blameless, he is not responsible for the circumstances he was born and raised in, and his developmental limitations growing up.  There is an undeniable link between Mr. Mirvis's unresolved childhood abuse and his involvement in his offense conduct.  Nevertheless, the guidelines dogmatically assert that such information "[is] not relevant in the determination of a sentence.  *See* U.S.S.G. § 5H1.10.  Accordingly, we respectfully ask the Court to consider Mr. Mirvis's background and upbringing in applying a variance for him.  *See discussion United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (E.D.N.Y. 2011) ("Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass.  Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.  Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.  That the defendants were born into circumstances without such support is at the center of this tragedy.").  *See also United States v. McBride*, 511 F.3d 1293, 1298 (11th Cir. 2007) ("About Defendant's own history, the district court also said that the Defendant 'has perhaps one of the worst histories that I have seen since being on the bench,

being essentially abandoned by his family and then consistently abused.'  We cannot conclude that the district court committed clear error in judgment in determining that a sentence considerably less than the Sentencing Guidelines' recommended range was appropriate."); and *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens.").

Post *Booker*, we can acknowledge that safe environments, resources, and expertise add to a person's prosperity and potential, but an individual lacking the same can be subverted and diverted from who they can become or fail when tested by adversity.  This common sense is at the core of individualized sentencing.  This is perhaps the guidelines' most significant flaw – its dogmatic disavowal of reality, embedded *in* U.S.S.G. § 5H1.12, which states, "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."  This begs the question: How much trust should we put in a sentencing scheme that ignores how reality operates?

Courts do not sentence fictional villains or caricatures, but people.

Moreover, the following discussion of Mr. Mirvis's background and characteristics is not an excuse for his conduct, but it is properly offered as a basis for a variance.  As Supreme Court case law and statutory authorities clarify, mitigation evidence is not permitted or presented as an excuse or justification for engaging in criminal conduct but rather for mitigating the length of a sentence or type of punishment to be imposed.  *See Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 and 21 U.S.C. § 850.  As Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about offenders' backgrounds and character is relevant because of the belief,

held by this society, that people who commit criminal acts that are attributable to disadvantaged backgrounds, or emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *Id*. at 545.

### 3. Physical and Mental Conditions, Drug or Alcohol Dependence, and Age

Pursuant to 18 U.S.C. § 3553(a)'s mandate, sentencing courts must consider the need to provide medical care or other treatment to offenders. Even the guidelines expressly recognize a defendant's medical condition "may be relevant in determining whether a departure is warranted, if, individually or in combination with other offender characteristics, it is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *See* U.S.S.G. § 5H1.4; *see, e.g.*, *United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure). *See also United States v. Martin*, 363 F.3d 25, 49-50 (1st Cir. 2004) (upholding departure when BOP had policy of not administering the only medication successful in treating defendant's Crohn's disease); *United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (finding no abuse of discretion where district court concluded BOP's letter stating its ability to handle medical conditions of all kinds was merely a form letter and that imprisonment posed a substantial risk to the defendant's life).

Mr. Mirvis has faced serious health issues, including gallbladder removal, skin biopsies, tooth extraction, and being diagnosed with liver disease, and, respectfully, this Court should consider Mr. Mirvis's medical needs. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); and *United States v.*

*Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) ("Although no one knows with any certainty how long Jenkins will live, we do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration. *See* Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. of Pub. Health 523, 526 (2013).").

Moreover, Mr. Mirvis struggles with trauma and cognitive issues, which must be considered, as they provide context for understanding his actions and current state of health and justify a downward variance. *Cf. United States v. Ventrilla*, 233 F.3d 166, 168 (2d Cir. 2000) (Discussing downward departure from the sentencing range on the ground of diminished capacity pursuant to U.S.S.G. § 5K2.13); *United States v. Walter*, 256 F.3d 891, 893 (9th Cir. 2001) ("On appeal, defendant challenged his 41-month sentence, asserting he was not a serious threat to the president, and that the court should have considered his history of abuse and diminished capacity, denying a downward departure under U.S. Sentencing Guidelines Manual § 5K2.13. The court of appeals reversed with instructions to the district court to hold an evidentiary hearing. It found the psychological effects of childhood abuse facially 'extraordinary,' and potentially warranted downward departure."); and *United States v. Risse*, 83 F.3d 212, 214 (8th Cir. 1996) ("The government cross-appeals the district court's downward departure at sentencing based on Risse's diminished capacity caused by posttraumatic stress disorder. We affirm on both issues."); *United States v. K*, 160 F. Supp. 2d 421, 425-26 (E.D.N.Y. 2001) (discussing diminished capacity and post-arrest conduct in determining sentence for mentally disabled defendant); and *United States v. Ventrilla*, 233 F.3d 166, 168 (2d Cir. 2000) (discussing downward departure from the sentencing range on the ground of diminished capacity pursuant to U.S.S.G. § 5K2.13).

A 10-year sentence, with therapy for Mr. Mirvis's trauma and cognitive issues, followed by five years of supervised release where he continues to receive therapy, as well as monitoring, and other rehabilitation programming under supervision will allow Mr. Mirvis to contribute to society.

Additionally, as a teenager, Mr. Mirvis experienced drug abuse, which he overcame. He would nevertheless welcome drug treatment. While drug or alcohol dependence or abuse is not necessarily relevant under the guidelines, *see* U.S.S.G. § 5H1.4, an effort to end drug or alcohol dependence through rehabilitation is a factor to consider as it shows that he is capable of growth. *United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992) (the Second Circuit held that the awareness of one's drug dependence "and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," is a reason for an adjustment). Accordingly, we respectfully ask the Court to consider this as a mitigating sentencing factor and recommend to the Bureau of Prisons that Mr. Mirvis receive drug and alcohol treatment while incarcerated.

Furthermore, Mr. Mirvis's age is also relevant since, generally, older people are less likely to commit further offenses. *See United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) ("post-*Booker* courts have noted that recidivism is markedly lower for older defendants."). In this context, the imposition of a prison sentence is unlikely to provide any more deterrent effect because Mr. Mirvis's age militates against the likelihood of recidivism.[4]

---

[4]*See* U.S. SENTENCING COMM'N, *The Effects of Aging on Recidivism Among Federal Offenders*, (December 2017) (demonstrating the strong influence age exerts on recidivism – older offenders are substantially less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed.), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

### 4.  Work History, Future Employment, Collateral Consequences

Mr. Mirvis has a strong work history.  While an offender's employment record, under the guidelines, is discouraged as a factor, *see United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990), it is a valid consideration, here, as a variance, as it demonstrates Mr. Mirvis's law-abiding character.  This is positive evidence that Mr. Mirvis is worthy of this Court's trust that he will live a law-abiding life.  Mr. Mirvis is fully aware of the challenges he will face in rebuilding his life, including being a registered sex offender.  His conviction will significantly affect his future employment and self-sufficiency prospects.  He will lose the right to vote, run for public office, serve on a jury, and the right to keep and bear arms.  We respectfully request the Court to consider these consequences in line with the guidance provided by § 3553(a).  *See United States v. Stewart*, 590 F.3d 93, 141 (2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); and *United States v. Gaind*, 829 F. Supp. 669, 670 (S.D.N.Y. 1993) ("The court determined that because of the destruction of defendant's business, the necessity for achieving the purposes of sentencing through sentencing itself had been reduced.  The court held that the destruction achieved in part the purposes of the sentence itself.").

Mr. Mirvis is specifically deterred from any further criminal conduct given the severe collateral consequences he faces, in combination with his own characteristics.

### 5.  Exceptional Acceptance of Responsibility, Sincere Contrition, Aberrant Behavior, and Rehabilitation

While incredibly serious, Mr. Mirvis's offense conduct is an aberration in his life.  His letter to the Court demonstrates his sincere contrition and personal growth and that the goals of individual and general deterrence will be met in this case by sentencing him to 10-years' custody followed by five years of supervision.  *See United States v. Reyes*, 9 F.3d 275, 280 (2d Cir. 1993)

(In determining whether the defendant has accepted responsibility for the full scope of the offense, the district court has the discretion to weigh a defendant's candor and remorse) (citing *United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir. 1991) (denial of § 3E1.1 reduction proper where district court determined defendant "had not shown remorse or acknowledged the wrongfulness of the conduct for which he was convicted"). *See discussion United States v. Paul*, 561 F.3d 970, 972 (9th Cir. 2009) ("In vacating the 16-month sentence, the court held that defendant's case did not fall within the 'heartland' of cases to which the U.S. Sentencing Guidelines were most applicable. The court also found mitigating factors indicating that the sentence was unreasonably high, including the fact that defendant was a first-time offender and displayed remorse."); *United States v. Hadash*, 408 F.3d 1080, 1081 (8th Cir. 2005) ("The court affirmed the downward departure as reasonable because it was based on the 18 U.S.C.S. § 3553(a) factors, which the district court listed to justify the departure and which included the nature of the offense, defendant's history as a law-abiding citizen who did a dumb thing, the need for correctional treatment, and a conclusion that defendant was not the type of defendant the guidelines were designed to punish."); *United States v. Kathman*, 490 F.3d 520, 521 (6th Cir. 2007) ("The Government argued that the district court erred in awarding a two-level reduction for acceptance of responsibility under U.S. Sentencing Guidelines Manual § 3E1.1 and that the downward variance from the advisory guideline range of 41-51 months was substantively unreasonable. The court held that the district court did not clearly err in finding that defendant demonstrated acceptance of responsibility under the circumstances."); *United States v. Autery*, 555 F.3d 864, 876 (9th Cir. 2009) ("Moreover, as a further deterrent, the district court threatened that if Autery violated any of the conditions of his probation, he would 'be back before me and receive the maximum penalty allowed by law.' It is said that there is nothing like being

sentenced to hang in the morning to focus a man's thoughts, and it is improbable that the district court's stern warning will be an ineffective deterrent in this case.").

Mr. Mirvis has undergone psychosexual evaluations, spoken with our mitigation specialist, worked in many prison jobs, and enrolled in numerous classes and programs. *See* Exhibit 2 (Defendant's Psychosexual Evaluation – Under Seal), 3 (Defendant's Mitigation Report – Under Seal), and 8 (Defendant's Certificates and Transcripts). Mr. Mirvis also regularly corresponds with people and organization about life and his recovery, including Jewish Prisoner, Sexaholics Anonymous, Compassion Prison Project, Just Detention International, and the American Bible Academy. *See* Exhibit 9. Mr. Mirvis also enjoys expressing himself through art, and we have attached a drawing of his to this submission at Exhibit 11.

Importantly, Mr. Mirvis writes to the Court and his victims:

> This prosecution presented me with a choice to grow as a person. I have worked hard over the past years to learn and improve myself. I took courses and programs in domestic violence and sexual abuse, had discussions with forensic psychologist Dr. N.G. Berrill about my crimes and sexuality, and discussed my life with social worker Anna Bulkin. I saw how I had become accustomed to wearing a fake mask and smile, suppressing what was broken in me. This made growing up even harder. I felt alienated. I couldn't focus on school and didn't have many friends. I didn't believe I deserved to be loved, get married, or raise a family. I felt inadequate and worthless. As an adult, I broke off relationships with good women because I thought their futures would be brighter without me. I eventually became angry at the world and myself.
>
> I'm committed to not hurting anyone in the future. While in prison, I've taken hundreds of hours of professional, developmental, and vocational courses and programs. I've read self-help books, participated in 12-step sex addiction programming, corresponded, and met with clergy. I have given to charities, including victims of domestic violence, school shootings, and sexual abuse. At the Metropolitan Detention Center, in Brooklyn, I worked on the suicide watch, as a recreational aide, and taught inmates to draw. At the Essex County Correctional facility, I've worked as a porter and a legal representative, helping inmates in the law library, and

> have been responsible for handing out computers and tablets to
> inmates.
>
>             *   *   *
>
> I am committed to regaining the trust I broke with society. I know
> that I deeply hurt my victims, and I want them to know they have
> the power to overcome what I did to them.

*See* Exhibit 1.

Given Mr. Mirvis's post-arrest conduct and remorse, a substantial downward variance is warranted. *See discussion United States v. Flowers*, 983 F. Supp. 159, 160 (E.D.N.Y. 1997) (discussing methods to evaluate defendant's rehabilitation); *Pepper v. United States*, 562 U.S. 476 (discussing likelihood that offender will engage in future criminal conduct is a central factor that district courts must assess when imposing sentence); and *United States v. Pallowick*, 364 F. Supp. 2d 923, 930 (E.D. Wis. 2005) ("I further concluded that sending defendant to prison for a lengthy period of time would not aid in his rehabilitation and might actually hinder the progress he made in counseling." (citing 18 U.S.C. § 3553(a)(2)(D)).

As Dr. Berrill describes in his report, Mr. Mirvis, despite the many challenges he has faced while incarcerated, ███████████████████████████████ and extorted by gang members, is working hard to change his life, as well as his perspective as it pertains to his sexuality, sexual conduct and involvement in the instant offense. As noted above, Dr. Berrill observes that Mr. Mirvis has benefited from his concerted effort to participate in a number of self-help programs, as well as participate in a 12-step program to address his past sexual misconduct, and has concluded: "At this point in time, he does not impress as someone who poses a likely threat to himself or others, nor is he someone who could be characterized sexually attracted to minors." *See* Exhibit 2 (Under Seal) at p. 16.



### 6. Charity and Good Works

Mr. Mirvis has contributed to charities and been involved in good works at his facilities, including suicide watch.  He has worked as a recreational aide and in victim support programs for domestic violence, school shootings, and sexual abuse.  He regularly donates to food banks and disaster assistance.  *See* Exhibit 9.  The guidelines provide that good works and charitable service "are not ordinarily relevant in determining whether a departure is warranted."  *See* U.S.S.G. § 5H1.11.  However, even before *Booker*, as concerning all such discouraged grounds, sentencing judges could properly depart based on a defendant's public service and good works if

such circumstances are present to an exceptional degree, so this Court can vary downward based on 18 U.S.C. §3553(a), which we ask the Court to do for Mr. Mirvis. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (variance approved where defendant served in Marine Corps for six years, was a volunteer firefighter for seven years, helped deliver three babies, and acted as a Good Samaritan on three distressful occasions in which others present were rendered helpless); *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006) (affirming three-level reduction where defendant had loaned money to neighbor and fellow farmers in need, saving farms from foreclosure, and helped finance the start up and continuation of businesses in local community); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (downward departure affirmed for a defendant who organized a youth football team in a depressed urban area, mentored the boys, and paid for one of the boys to go to college; these were not detached acts of charity but hands-on personal sacrifices, which must have had a dramatic and positive impact on the lives of others); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) (affirming downward departure where defendant, a state legislator, had engaged in acts of personal kindness and good works that were "above and beyond" customary politics or charitable giving); *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998) (defendant paid for others to attend a private school, and both had graduated and become productive members of society); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (upholding departure based in part on defendant's long history of community service and his strong support in the community, even among family of the victim).

## F.    Harsh Conditions of Confinement

The full force of a guidelines sentence is not merited because of the conditions of confinement that Mr. Mirvis has faced while being detained since 2017, including the entirety of

the COVID-19 pandemic.  As this Court is aware, the conditions he and other inmates endured were unusually harsh and exceeded the normal loss of liberty inherent in pretrial detention.

Beginning in March 2020, the MDC imposed exceptional restrictions to prevent the transmission of COVID-19 in the jail.  These include repeated and prolonged periods of 24-hour lockdowns.  At various points during the pandemic, including for several month-long stretches during peak COVID transmissibility, such as the Omicron wave, Mr. Mirvis was only allowed out of his cell for several hours a week.  Those times were his only opportunities to engage in recreation and showering.  The institution's food offerings were reduced to cold baloney sandwiches and bruised fruit, and the jail drastically curtailed the commissary provisions he could order to supplement the jail's meager fare.  Finally, Mr. Mirvis has had less access to educational or vocational programming to better himself, which is why he has relied on correspondence courses.

In recognition of the excessively punitive conditions of pretrial detention during and after the COVID-19 pandemic, judges in the Eastern and Southern Districts of New York have granted leniency to defendants, even in serious cases like this.  These courts have acknowledged that the unusual harshness of incarceration diminishes the retributive or deterrent need for a guidelines sentence.  They have also imposed terms of imprisonment that are substantially less than the bottom of the defendants' advisory ranges.

This approach is consistent with the leniency fellow judges in this and the Southern District have shown to defendants detained during the pandemic, especially during its first year and then again during the Omicron wave, when the jail's restrictions were particularly severe. *See, e.g.*, *United States v. Brown*, No. 20-cr-460 (NGG) (E.D.N.Y. Mar. 11, 2022) (imposing 96 months in serial armed robbery case where bottom of guidelines range was 262 months); *United*

*States v. Clark*, No. 20-cr-241 (NGG) (E.D.N.Y. May 7, 2021) (imposing 96 months in armed robbery case where bottom of guidelines range was 114 months); *United States v. Narcissi*, No. 20-cr-449 (RPK) (E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence of 7 months, where guidelines range was 24-30 months); *United States v. Colon*, No. 15-cr-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Shi*, No. 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where guidelines range was 12-18 months); *United States v. Piper*, No. 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had served approximately 24 months and bottom of guidelines range was 63 months). *See also, e.g.*, *United States v. Searles*, No. 19-cr-381 (GBD) (S.D.N.Y. Mar. 25, 2021) (imposing 48-month sentence in Hobbs Act robbery case where bottom of guidelines range was 120 months); *United States v. Soto*, No 19-cr-903 (KMW) (S.D.N.Y. Mar, 19, 2021) (imposing 60-month sentence where bottom of guidelines range was 120 months); *United States v. Marmolejo*, No. 20-cr-1 (JSR) (S.D.N.Y. Feb. 3, 2021) (imposing 18-month sentence where bottom of guidelines range was 87 months); *United States v. Almonte*, No. 19-cr-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of guidelines range was 51 months); *United States v. Garcia*, No. 19-cr-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Camacho*, No. 19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, No. 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months); *United States v. Cirino*, No. 19-cr-323 (JSR) (S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of guidelines range was 57 months); *United States v.*

*Aracena de Jesus*, No. 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines range was 30 months).

A below-guidelines sentence would be in keeping with the lenity fellow judges in the Eastern and Southern Districts have bestowed to defendants detained during the pandemic.

**G.      Deportation**

Another reason justifying a variance is that Mr. Mirvis is subject to deportation apparently to Ukraine, a country he is not a citizen of and has no connection. *See* 8 U.S.C. § 1101(a)(43)(J); and 8 U.S.C. § 1227(a)(2)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."). In the sentencing context:

> Critical to the determination of an appropriate sentence is the likelihood that [a] defendant will be deported as a result of his conviction. As discussed ... this basic fact is relevant to each of the Section 3553(a)(2) factors.
>
> Even without a lengthy term of incarceration, [a] defendant will be adequately punished for his wrongdoing by his expulsion from the United States. He will be transported to a foreign country … to which he has no meaningful connection. He will be separated from his [family]; from his friends; and from the only community he has known throughout his teenage and adult life.

*United States v. Chong*, 2014 U.S. Dist. LEXIS 135664, at *32-33 (E.D.N.Y. 2014). This rationale applies to Mr. Mirvis, and is an appropriate factor justifying a downward variance.

**H.      Conclusion**

We respectfully urge the Court to vary from the Guideline range based on the 18 U.S.C. § 3553(a) factors set forth in this memorandum and impose a sentence of 10-years' incarceration and five years supervised release. This is a significant penalty that amply punishes Mr. Mirvis for his offense conduct, maintains and encourages respect for the administration of justice, and

serves as individual and general deterrents.  It is, in short, a sufficient, but not greater than necessary sentence.

Mr. Mirvis respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

Dated:          Brooklyn, New York
                    September 25, 2024

                                                  Respectfully submitted,

                                                  /s/_____
                                                  MICHAEL HUESTON, ESQ.
                                                  DOREA SILVERMAN, ESQ.